**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROXANNE COVINGTON, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action |
| v. | : | |
| | : | No. 24-cv-1571-JMY |
| PLYMOUTH TOWNSHIP POLICE | : | |
| DEPARTMENT, POLICE OFFICER | : | |
| DOUGLAS WELLS, AND MILAN DEAN- | : | |
| BREWER | : | |
| | : | |
| Defendants. | | |

## <u>MEMORANDUM</u>

**Younge, J.**                                                                **April 18, 2025**

## I.    INTRODUCTION

Innocent uninvolved drivers on the road do not lose their clearly established rights when police are in hot pursuit of a suspect. Roxanne Covington ("Plaintiff"), an innocent motorist, alleges that her constitutional and common law rights were violated by a Plymouth Township police officer during a high-speed chase to apprehend a suspected kidnapper. While this officer's body and dash cameras capture much of the incident, the parties disagree on the proper interpretation of the video and the events that unfold off-camera. Because of this factual dispute, and Defendants' failure to demonstrate that immunity covers these claims, this case is ripe for a jury to decide. For these reasons, and as further detailed in this Memorandum, Defendants Plymouth Township Police Department (hereinafter "PTPD") and Police Officer Douglas Wells'

(hereinafter "Officer Wells") Motion for Summary Judgment is GRANTED in PART and DENIED in PART.[1]

## II.    BACKGROUND

On October 9, 2022, Defendant Milan Dean-Brewer and another suspect (together, the "suspects") stole a grey/silver Dodge Charger ("Charger" or "suspect vehicle") that was reportedly occupied by a twelve-year-old girl. (Def.'s Und. Facts, ECF No. 24 ¶¶ 5-6; Pl's Resp. to Def.'s Und. Facts, ECF No. 28-1 ¶ 6). After the suspects fled Philadelphia, where the Charger was stolen, and traveled through the surrounding counties, Plymouth Township police officers were requested to assist in the pursuit of the suspect vehicle. (Def.'s Und. Facts ¶¶ 5, 7). Officer Wells, a Plymouth Township police officer, responded to the call to assist, and was informed that a kidnapped child was in the Charger. (Def.'s Und. Facts ¶ 8-9). Wells' subsequent actions were recorded by his body and dash cameras. (Def.'s Exhibit C, ECF No. 24-3 ("Dash Camera"); Def.'s Exhibit F, ECF No. 24-6 ("Body Camera")).[2]

As Officer Wells drove his Plymouth Township police SUV westbound on Ridge Pike, he was advised via radio that the suspect vehicle was also traveling westbound on Ridge Pike at a "high rate of speed." (Def.'s Und. Facts ¶¶ 10-11). Upon receiving this information, Officer Wells turned around to travel eastbound on Ridge Pike, activated his lights and sirens, and joined the search for the Charger. (Def.'s Und. Facts ¶¶ 12). Meanwhile, ahead of the suspect vehicle, Roxanne Covington, a bystander uninvolved in the pursuit, was also driving westbound on Ridge

---

[1] Currently before this Court is The Court finds this Motion appropriate for resolution without oral argument. Fed. R. Civ. P. 78; L.R. 7.1(f).

[2] The Court will reference the time stamps as they appear in the respective videos.

Pike.[3] (Def.'s Und. Facts ¶ 17; Pl.'s Und. Facts ¶ 1). Covington was operating a black Porsche SUV along with a friend, Olga Alanos, who sat in the front passenger seat. (Def.'s Und. Facts ¶¶ 18, 20; Pl.'s Und. Facts ¶ 1).

Now driving towards Covington and the suspects, Officer Wells crossed into the westbound lane, crossed back into the eastbound lane, and then stuck his hand out of the window to slow oncoming traffic. (Def.'s Und. Facts ¶¶ 13-15; Pl.'s Und. Facts ¶¶ 1-2). Thereafter, Covington and other vehicles slowed to a stop some distance in front of Officer Wells. (Def.'s Und. Facts ¶¶ 25, 27; Pl.'s Und. Facts ¶¶ 1-2; Dash Camera, 20:55:54-20:55:59).

Officer Wells continued east, then stopped his vehicle in the eastbound lane, roughly parallel to Covington's stopped vehicle in the westbound lane.[4] (Dash Camera, 20:55:55-20:56:03). As he brought his vehicle to a stop next to Covington's vehicle, Officer Wells says "stop" twice. (Body Camera, 16:55:58-16:56:03). When both vehicles became stationary, their hoods were positioned next to each other. (Def.'s Und. Facts ¶ 28). In this position, Covington attempted to speak to Officer Wells through her rolled down window. (Pl.'s Und. Facts ¶ 2; Def.'s Und. Facts ¶ 28). However, prior to any conversation through the window, and in those moments, the suspect vehicle approached traveling westbound. (Pl.'s Und. Facts ¶ 2; Def.'s Und. Facts ¶ 29).

---

[3] Plaintiff is a Court of Common Pleas Judge in Philadelphia. (Pl.'s Und. Facts ¶ 1). For the purposes of this Memorandum, Judge Covington hereinafter will be referred to as either "Covington" or "Plaintiff."

[4] The parties dispute whether Covington was already stopped when Officer Wells came to a stop. (Pl.'s Resp. to Def.'s Und. Facts ¶ 28). However, Officer Wells' dash camera shows that Covington was not moving when he stopped next to her. Then, moments after he was stopped, Covington slightly inched her vehicle forward. (Dash Camera, 20:55:55-20:56:03). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it," a court should view "the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Accordingly, Covington was stopped when Officer Wells stopped next to her.

From a few cars behind Covington's vehicle, the Charger swerved out of the westbound lane and went into the eastbound lane toward Officer Wells. (Def.'s Und. Facts ¶ 29). Then, when the Charger was close to Officer Wells, he accelerated his vehicle forward and to the right, striking the Charger head-on. (Def.'s Und. Facts ¶¶ 30, 33). The Charger glanced off Officer Wells' vehicle and struck the rear of Covington's vehicle. (Def.'s Und. Facts ¶ 34; Pl's Und. Facts ¶ 2). The contact brought the Charger to a stop. (Def.'s Und. Facts ¶ 40). There never was any contact between Officer Wells' vehicle and Covington's vehicle. (Def.'s Und. Facts ¶ 35).

Moments after this collision, while still sitting in his vehicle, Officer Wells drew his firearm. (Def.'s Und. Facts ¶ 41; Pl's Resp. to Def.'s Und. Facts ¶ 39). With gun in hand, Officer Wells yelled "get out" and exited his vehicle. (Def.'s Und. Facts ¶¶ 39, 47). Meanwhile, in Covington's vehicle, Ms. Alanos was screaming that "he's got a gun." (Pl.'s Und. Facts ¶ 2). Covington claims that Officer Wells pointed the gun at her momentarily and that she instructed Ms. Alanos to get down. (Pl.'s Und. Facts ¶ 2). Officer Wells denies that he pointed his firearm out of the window or at Covington's vehicle.[5] (Def.'s Und. Facts ¶¶ 45, 52).

By the time Officer Wells existed his vehicle, the suspects had fled from the Charger and the scene. (Plaintiff's Exhibits, ECF No. 31, p. 14; Body Camera, 16:56:26-16:56:37). Officer Wells searched the Charger for one of the suspects but saw that it was not occupied by any person. (Def.'s Und. Facts ¶ 54; Plaintiff's Exhibits, ECF No. 31, p. 16; Body Camera, 16:56:26-16:56:37).

---

[5] Officer Wells' dash and body camera do not depict Officer Wells pointing his firearm out of the window or at Covington's vehicle. However, the absence of these actions in the videos does not mean that the actions did not occur. The cameras are not recording panoramic videos, so there are actions outside of their view that are not included in their respective videos. That said, Officer Wells' body camera only shows him pointing his gun in the direction of the driver-side window as he exited his vehicle. (Body Camera, 16:56:10-16:56:26).

The reported kidnapped child was later located at a hospital in Philadelphia. (Plaintiff's Exhibits, ECF No. 31, p. 12).

The next month, Covington submitted a letter to Plymouth Township Chief of Police John C. Myrsiades, requesting an internal investigation into the collision and claiming that Officer Wells "us[ed] her vehicle as a barricade to stop a suspect that was being chased by the police." (Def.'s Und. Facts ¶¶ 60-61; Def.'s Exhibit G, ECF No. 24-7, p. 8). Upon this request, Lieutenant Jeffrey O'Brien reviewed the police reports and videos of the incident and interviewed Officer Wells. (Def.'s Und. Facts ¶ 63). Lt. O'Brien provided a report of this investigation to Chief Myrisades, whereupon he concluded, in part, that "Officer Wells was not using Covington or any other motorist as a barricade to stop the suspect vehicle." (Def's Und. Facts ¶¶ 65-66; Def.'s Exhibit G, p. 10).

Although not mentioned in Lt. O'Brien's report, the PTPD maintained policies and procedures that were relevant to Officer Wells' actions, including a policy on "Vehicle Pursuits." (Def.'s Und. Facts ¶ 68; ECF No. 31, p. 32-44). This policy extensively outlines "the guidelines for vehicle pursuits in order to protect the safety of involved officers, the public and fleeing suspects." (ECF No. 31, p. 32). Pursuant to the policy, and 75 Pa.C.S. § 6342 cited in the policy, officers are instructed to weigh several factors when deciding to "initiate or continue a pursuit," including "[t]he importance of protecting the public and balancing the known or reasonably suspected offense and the apparent need for immediate capture against the risks to officers, innocent motorists and others." (ECF No. 31, p. 33-34). A similar factor analysis must be weighed by an officer in their determination of when to terminate a pursuit. (ECF No. 31, p. 34).

Further, the policy outlines certain privileges officers are afforded "when in pursuit of a suspect and provided there is no unreasonable risk to persons and property," including

"[d]isregard[ing] regulations governing direction of movement, overtaking vehicles or turning in specified directions." (ECF No. 31, p. 32-33). Despite these privileges, the policy explains the limitation on certain police actions:

> During the course of motor vehicle pursuit, deliberate contact with the suspect's vehicle or forcing the suspect vehicle into parked cars, ditches or any obstacles, boxing in, hitting off, and any other hazardous driving maneuvers shall not be engaged in by any pursuit vehicle unless specifically authorized and in strict adherence to the Pursuit Intervention section of this policy and the Use of [F]orce policy.

(ECF No. 31, p. 35). The policy goes on to explain that an officer's decision to apply pursuit intervention tactics also requires a balancing test:

> Whenever practicable, an officer shall seek approval from a supervisor before employing any intervention to stop the pursued vehicle. In deciding whether to use intervention tactics, officers/ supervisors should balance the risk of allowing the pursuit to continue with the potential hazards arising from the use of each tactic to the public, the officers and persons in or on the pursued vehicle. With this in mind, the decision to use any intervention tactic should be reasonable in light of the circumstances apparent to the officer at the time of the decision.

(ECF No. 31, p. 41). At his deposition, Chief Myrsiades maintains that this policy is not applicable because Officer Wells was searching for the suspects—not in pursuit in of them. (ECF No. 28-3, p. 102, 104).

On April 14, 2024, Plaintiff initiated this lawsuit by filing a Complaint against Officer Wells and the PTPD (collectively, the "Plymouth Defendants"). (ECF No. 1). In response, on June 20, 2024, the Plymouth Defendants filed an Answer to the Complaint (ECF No. 8) along with a Third-Party Complaint against Milan Dean-Brewer. (ECF No. 9). Then, with the Plymouth

Defendants' consent, Plaintiff filed an Amended Complaint on September 17, 2024, which added Dean-Brewer as a defendant. (Am. Compl., ECF No. 18).[6]

In her Amended Complaint, Plaintiff presents four counts against Defendants, several of which contain multiple claims. Specifically, Plaintiff's Amended Complaint asserts constitutional claims under 42 U.S.C. § 1983 against PTPD (Count I), alleging that PTPD's failure to train violated Plaintiff's Fourth and Fourteenth Amendment rights; constitutional claims under 42 U.S.C. § 1983 against Officer Wells (Count II) based on violations of Plaintiff's First, Fourth, and Fourteenth Amendment rights; a false arrest and false detention claim against Officer Wells (Count III); and a negligence claim against all the Defendants (Count IV). (Am. Compl.).

The Plymouth Defendants now move this Court for summary judgment, seeking dismissal of all claims asserted against them.

## III.    LEGAL STANDARD

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 24-49 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008). A material fact is one that "might affect the outcome of the suit under the

---

[6] On February 4, 2025, Plaintiff requested an entry for default against Defendant Milan Dean-Brewer pursuant to Federal Rule of Civil Procedure 55. (ECF No. 26). At the time of Plaintiff's request, and after personally serving Dean-Brewer at his residence on September 17, 2024, Defendant Dean-Brewer had not answered nor responded to the Amended Complaint. (ECF No. 26). On February 5, 2025, the Court entered default against Defendant Milan Dean-Brewer for failure to plead or otherwise defend. (ECF No. 27).

governing law[.]" *Anderson*, 477 U.S. at 248. A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Id*.

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). When the movant is the defendant, they have the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of her case." *Burton v. Teleflex Inc.,* 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains their initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001). Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## IV.  DISCUSSION

### A.  Officer Wells Is Not Entitled to Qualified Immunity from Plaintiff's Section 1983 Claims

Plaintiff claims that Officer Wells, "acting under the color of state law," (FAC ¶ 43), violated her constitutional rights, making Officer Wells "subject to liability under § 1983." *Curley*

*v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002). Under a Section 1983 claim, "a plaintiff must allege both a deprivation of a federally protected right and that this deprivation was committed by one acting under color of state law." *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005). Generally, "Section 1983 claims against police officers often raise issues pertaining to the defense of qualified immunity." *Id.* This defense "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal citations omitted).

In the Third Circuit, courts conduct a two-step inquiry to determine whether an officer is entitled to qualified immunity. *See Morgan v. Fiorentino*, 811 F. App'x 798, 802 (3d Cir. 2020). First, courts ask "whether the plaintiff sufficiently alleged the violation of a constitutional right." *Id.* "If the facts, when viewed in the light most favorable to the plaintiff, do not show that the officer violated a constitutional right, then plaintiff's § 1983 claim must fail." *Cox v. Hackett*, No. 05-2260, 2006 WL 2129060, at *8 (E.D. Pa. July 27, 2006) (citing *Curley*, 298 F.3d at 277). Second, when the facts do show a violation, courts ask "whether the right was 'clearly established' at the time of the official's conduct." *Morgan*, 811 F. App'x at 802. "If a court concludes that an officer's conduct did violate a clearly established constitutional right, then it must deny him the protection afforded by qualified immunity." *Curley*, 298 F.3d at 277. At summary judgment, as here, if there are disputed facts that are material to the qualified immunity determination, then the official is not entitled to the immunity at that stage. *See Ciardiello v. Sexton,* 390 F. App'x 193, 201 (3d Cir. 2010); *see also Q.M. v. Cty. of L.A.*, No. 21-9382, 2025 U.S. Dist. LEXIS 49466, at *26-27 (C.D. Cal. Mar. 18, 2025) ("[T]he facts necessary to establish whether the Deputies

committed a constitutional violation are in dispute which makes granting summary judgment on qualified immunity improper.").

Under this analytical framework, Officer Wells raises two arguments: first, that his actions did not violate Plaintiff's constitutional rights; and second, even if those actions amounted to a constitutional violation, he would be entitled to qualified immunity because the rights in question were not "clearly established" at the time of the collision. In a court's review of these arguments, "officers bear the burden of persuasion under each prong." *Anglemeyer v. Ammons*, 92 F.4th 184, 188 (3d Cir. 2024).

This Court has discretion to choose which prong of this analysis to decide first. *See Pearson*, 555 U.S. at 236. I will begin this analysis by reviewing the alleged constitutional violation, and then determine whether the proposed right is clearly established. *See Dongarra v. Smith*, 27 F.4th 174, 177 (3d Cir. 2022) (explaining that this order is "logical" and contributes to the "development of constitutional law.").

### i.    *A Reasonable Jury Could Find a Constitutional Violation*

Plaintiff claims that Officer Wells violated her rights secured by the First, Fourth, and Fourteenth Amendments. In response, Officer Wells argues that his actions assisting in the apprehension of the suspect vehicle did not cause a constitutional violation, making Plaintiff's Section 1983 claim fail as a matter of law. (Def.'s Brief, ECF No. 25-1, p. 7).

As an initial matter, Plaintiff's briefing abandoned the First Amendment violation pled in her Complaint. (Pl.'s Brief, ECF No. 28). Officer Wells highlights that the Complaint does not present any theories of a First Amendment violation nor do the alleged facts implicate the First Amendment. (Def.'s Brief, pp. 7-9). The Court agrees. Because Plaintiff does not defend this deficiency nor present argument to support her First Amendment claim, the court will consider

this claim abandoned, *see, e.g., Carroll v. Lancaster Cnty.*, 301 F. Supp. 3d 486, 511 (E.D. Pa. 2018) (considering claim abandoned where not addressed in opposition brief and granting summary judgment); *Laymon v. Honeywell Int'l Inc.*, 645 F. Supp. 3d 443, 458 (W.D. Pa. 2022) ("Plaintiff's failure to respond substantively to Defendant's Motion for Summary Judgment on the hostile work environment claim amounts to an abandonment those claims, and the entry of summary judgment as to those claims is appropriate"), so summary judgment is granted to Officer Wells for Plaintiff's First Amendment claim.

On the other hand, with respect to the Fourth and Fourteenth Amendment, a reasonable jury could find that there were constitutional violations.

### 1.  Fourth Amendment

The Fourth Amendment provides "[t]he right of people to be secure in their persons… against unreasonable search and seizures." U.S. Const. amend. IV. Plaintiff argues that this right was violated when Officer Wells subjected her to a false arrest, false imprisonment and unlawful search and seizure. (Pl.'s Brief, pp. 9-13). To state a Section 1983 claim "for an unlawful seizure, a plaintiff must plead that (1) a seizure occurred and (2) it was unreasonable." *Bynum v. Trustees of the Univ. of Pennsylvania*, No. 14-4548, 2014 WL 6473344, at *5 (E.D. Pa. Nov. 18, 2014) (citing *Estate of Smith v. Marasco,* 430 F.3d 140, 148 (3d Cir. 2005)). Plaintiff's false arrest and false imprisonment claims are nearly identical causes of action that courts analyze together. *See Wilson v. Dewees*, 977 F. Supp. 2d 449, 455 (E.D. Pa. 2013); *see also LeCount v. Kropp*, No. 25-1161, 2025 WL 790935, at *2 (E.D. Pa. Mar. 12, 2025). To state these claims under Section 1983, a plaintiff must "establish that: (1) there was an arrest; and (2) the arrest was made without probable cause." *Saintil v. Borough of Carteret*, No. 22-2898, 2024 WL 3565308, at *6 (3d Cir. July 29, 2024) (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995)).

Although similar, the elements of a false arrest/imprisonment claim are different from those in an unlawful search and seizure claim. This distinction is explained succinctly by Judge Robreno in *Bryant v. City of Philadelphia*:

> While an arrest constitutes the most clear example of a seizure, actions short of arrest also count as seizures for Fourth Amendment purposes whenever a law enforcement officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The degree of justification required to render a seizure reasonable under the Fourth Amendment varies according to the nature and scope of the detention: "some seizures ... constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity." *Michigan v. Summers,* 452 U.S. 692, 699, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). Thus the level of intrusion on a person's liberty determines whether an individual has been arrested or merely seized, and the corresponding level of justification required varies accordingly.

890 F. Supp. 2d 591, 599 (E.D. Pa. 2012), *aff'd* 518 Fed. App'x. 89 (Mar. 15, 2013). Stated otherwise, what constitutes a seizure may not necessarily qualify as an arrest, and what is considered reasonable might not meet the threshold of probable cause for an arrest. *See United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014) (describing the "broad categories" of police encounters and their corresponding degree of "constitutional scrutiny."). Accordingly, because Officer Wells specifically argues that there was no "seizure," as defined by the Fourth Amendment, I will begin there before looking at arrest. (Def.'s Brief, pp. 10-13).

### a.  *Seizure and Arrest*

Pursuant to the Fourth Amendment, the Supreme Court instructs that "[i]t must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Michigan v. Summers*, 452 U.S. 692, 696 n.5 (1981) (quoting *Terry*, 392 U.S. 1, 16 (1968)). Therefore, a seizure occurs when an "officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen[.]" *Id.* at 680. The

Courts' test to determine whether there was a "show of authority" is objective, not asking "whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *United States v. Smith*, 575 F.3d 308, 313 (3d Cir. 2009) (quoting *California v. Hodari D.,* 499 U.S. 621, 628 (1991)). This analysis considers the totality of circumstances, including the following factors that are indicative of a seizure: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *James v. City of Wilkes-Barre,* 700 F.3d 675, 680 (quoting *U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980)).

Further, a "Fourth Amendment seizure… [occurs] only when there is a governmental termination of freedom of movement *through means intentionally applied.*" *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989). Such "[a] seizure occurs even when an unintended person is the object of detention, so long as the means of detention are intentionally applied to that person." *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 269 (3d Cir. 2000). And so, for example, "if a police officer fires his gun at a fleeing robbery suspect and the bullet inadvertently strikes an innocent bystander, there has been no Fourth Amendment seizure." *Id.* The Court's analysis of intent questions whether the evidence "demonstrates an **objective intent** to restrain movement." *Gross v. Cairo,* No. 22-2920, 2023 WL 8646265, at *2 (3d Cir. Dec. 14, 2023) (emphasis added); *see also In re City of Philadelphia Litig.*, 158 F.3d 711, 722 (3d Cir. 1998) ("we think it reasonable to read *Brower* as focusing on the objective intent of officials to use force to effectuate a seizure and the subsequent seizure flowing from the use of that force, rather than upon the subjective intent of officials…").

With respect to this requirement, Officer Wells argues that there was no seizure because he neither intended to conduct a seizure nor intended to specifically seize Plaintiff. (Def.'s Brief, p. 10, 12). To adequately address Officer Wells' argument, it makes sense to first identify the alleged seizure that he claims was unintentional. The parties disagree on whether Plaintiff was seized when she stopped on Ridge Avenue. (Pl.'s Brief, p. 13).[7] However, construing the facts in a light favorable to Plaintiff, a jury could find that Officer Wells' actions prior to Plaintiff stopping was a show of authority. By the time Plaintiff stopped, Officer Wells, driving a black SUV, had traveled towards her with his lights flashing, sirens activated, with his hand stuck out of his window positioned in a signal to slow oncoming traffic. Then, when he was close to Plaintiff, he said "stop" twice. Courts have considered these circumstances and actions as factors that favor a show of authority. *See United States v. Williams*, No. 23-2980, 2025 WL 101068, at *3 (3d Cir. Jan. 15, 2025) ("Other factors include… use of police lights or sirens, commands to stop or show hands, or repeated commands."). When considering these factors together, a jury could find that a reasonable person would not have felt free to leave, such that Plaintiff was seized. In fact, Officer Wells' briefing later concedes that "the facts demonstrate [that] it was not the physical movement of Officer Wells's [sic] vehicle that caused Plaintiff to stop, but rather the authority of a police officer approaching with lights and sirens activated." (Def.'s Brief, p. 30).

---

[7] Notably, neither party discusses whether Plaintiff was seized when Officer Wells allegedly pointed his firearm at her. Yet, at the same time, the parties dispute whether this happened. And, as mentioned, the videos do not provide clarity on the issue. While "[t]here is no per se rule that pointing guns at people… constitutes an arrest," that fact is certainly material to the arrest analysis. *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995) (analyzing whether the "use of guns" was "justified by the circumstances" to determine whether there was an arrest). This material dispute of fact would warrant denying summary judgment. However, because I will deny summary judgment for the Fourth Amendment claim on other grounds, allowing it to be presented to a jury, I decline to rule on an argument that neither party presented.

Despite this concession, Officer Wells argues that there was no seizure because Plaintiff "stopped voluntarily in reaction to Officer Wells' use of lights and sirens." (Def.'s Brief, p. 11). Officer Wells directs the Court to three district court cases in this Circuit to make this point: *United States v. Wilmington*, 240 F. Supp. 2d 311 (M.D. Pa. 2002); *United States v. Martin*, 618 F. Supp. 3d 205 (W.D. Pa. 2022); and *United States v. Harrison*, No. 17-228, 2018 WL 4405892 (E.D. Pa. Sept. 17, 2018). (Def.'s Brief, p. 11). In these cases, the courts emphasized that an individual's compliance with an officer's request does not in of itself mean that there was a seizure; rather, there is a seizure when said compliance is in response to a show of authority communicating to a reasonable person that they are not free to leave. *See Wilmington*, 240 F. Supp. 2d at 315-316; *Martin*, 618 F. Supp. 3d. at 213-216; *Harrison*, 2018 WL 4405892, at *4-5. However, this point does not contribute to the current discussion because, as explained above, there is evidence of Officer Wells' show of authority. In the cases presented by Officer Wells, the officers' actions did not amount to a show of authority, *see Harrison*, 2018 WL 4405892, at 5 ("Nor does the Court find that Harrison was seized when, according to him, he was asked to lower his window."); *Wilmington*, 240 F. Supp. 2d at 316 ("There is simply no evidence of duress or coercion on the part of the investigators."); *Martin*, 618 F. Supp. 3d.at 215 ("Defendant was not seized when Detective McGee approached his vehicle and shined a flashlight in the passenger window or tapped on it."), so they are distinguished from this case in that regard.

Next, when the facts surrounding the alleged seizure are construed in the light most favorable to Plaintiff, a jury could find that Officer Wells' actions were intentionally applied. Officer Wells directs the Court to his deposition, where he testified that he did not direct Plaintiff specifically to stop, but rather "was directing multiple vehicles that were coming at [him] to slow." (Def.'s Exhibit A, p. 8). He explains that he did this to "observe for the suspect vehicle and try to

rescue the 12-year-old-girl." (Def.'s Exhibit A, p. 11). However, this testimony is not enough to grant summary judgment in his favor. First, the question of intentionality "does not turn on the subjective intent of the officer," *Brower*, 489 U.S. at 600 (Stevens, J, concurring) (interpreting the majority's test), so what Officer Wells' subjectively believed he was doing cannot be the chief factor to decide this issue. Second, even when considering Wells' subjective intent articulated at his deposition (i.e., to direct traffic, find the suspect, and save the child), that evidence could still lead a jury to infer that, objectively, he intended to implement the actions that led to Plaintiff's movement being restrained. Stated otherwise, the ends of Wells' intentions allow a jury to infer that he intended the means of his actions. Finally, Wells' admission that he intended his actions to be applied to ongoing traffic does not rebut that his actions were intentionally applied to Plaintiff. To the contrary, because Plaintiff was a member of the ongoing traffic, this admission allows the jury to infer that Wells' show of authority was also intentionally applied to Plaintiff, who was subject to the intentions that were applied to the group. Unlike the stray bullet hypothetical mentioned above, *see Berg, supra*, Plaintiff was included in the larger group that was the target of Officer Wells' intentions. Officer Wells does not point to case law requiring the level of specificity that he asks the Court to apply, so the Court will decline to require it here. Moreover, because Officer Wells says "stop" twice near Plaintiff, a jury could find that Officer Wells did specifically intend to seize Plaintiff and not oncoming traffic.

Finally, Officer Wells argues that there was no seizure because he was "vested with the statutory authority to exercise his police powers to control traffic and investigate an in-progress/kidnapping." If this were true, then no traffic stop, which are generally executed through powers given by statutory authority, would be a seizure. To the contrary, courts have long recognized that traffic stops are seizures. *See, e.g, United States v. Mosley*, 454 F.3d 249, 253 (3d

Cir. 2006) (citing *Delaware v. Prouse,* 440 U.S. 648, 653 (1979)) ("[I]t is settled law that a traffic stop is a seizure of everyone in the stopped vehicle."). Officer Wells' argument about the authority for the stop is more appropriate in the Court's discussion of the reasonableness of the seizure, of which the Court will address in the next section. Accordingly, Officer Wells has not demonstrated that summary judgment should be granted for lack of a seizure.

That said, the Court is compelled to acknowledge the peculiar nature of this case. Plaintiff was not the intended target of arrest, subject to an investigation, nor in the vicinity of the execution of a warrant, so the circumstances of her seizure do not fit neatly into Fourth Amendment precedent. Nevertheless, Plaintiff can meet the rather difficult, but not impossible burden of persuading a jury that her Fourth Amendment rights were violated, even though she was certainly not the intended target of the police pursuit. As outlined above, the principles of the Fourth Amendment are still applicable here, which could lead a jury to find that Officer Wells' actions amounted to a seizure of Plaintiff's person. Because "brief seizures are seizures all the same," *Torres v. Madrid*, 592 U.S. 306, 318 (2021), "even innocent bystanders who are temporarily detained have been subjected to a seizure for purposes of the Fourth Amendment." *Corbitt v. Vickers*, 929 F.3d 1304, 1314 (11th Cir. 2019).

While there is evidence for a jury to consider that Plaintiff was seized when she stopped, when construing the facts and inferences in Plaintiff's favor, a jury would not be able to find that the stop was an arrest. According to the Third Circuit, "there is no per se rule about the length of time a suspect may be detained before the detention becomes a full-scale arrest;" instead, courts "must examine the reasonableness of the detention, particularly whether the police were diligent in accomplishing the purpose of the stop as rapidly as possible." *Baker v. Monroe Twp.*, 50 F.3d 1186, 1192 (3d Cir. 1995). As mentioned, Officer Wells testified that the purpose of the stop was

to regulate traffic, observe for the suspect vehicle, and rescue the kidnapped child. Because the events of the stop took place over approximately 40 seconds, (Dash Camera, 20:55:36-20:56:08), there is no indication that Officer Wells did not act "promptly" or "engaged in dilatory conduct" during this brief period. *See United States v. Robinson*, 821 F. App'x 141, 145 (3d Cir. 2020) (finding that duration of the arrest did not convert the stop into an arrest). On the other hand, if the purpose of the stop was to apprehend the suspect, there is still no evidence that Officer Wells did not act diligently to accomplish that purpose in this brief period, so no jury could find that Plaintiff was arrested. Without a finding of an arrest, the Court grants summary judgment for Officer Wells with respect to Plaintiff's false arrest/imprisonment claim.

### b. *Reasonableness*

Having determined that a jury could find that Plaintiff was seized, but not arrested, I will analyze whether the seizure was unreasonable. While "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," courts must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Accordingly, "[w]hether a search or seizure is unreasonable depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Price v. City of Philadelphia*, 239 F. Supp. 3d 876, 894–95 (E.D. Pa. 2017) (quoting *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 616 (1989)) (internal quotation marks omitted). The Supreme Court describes this analysis as a "balancing of competing interests," where a court weighs the "nature and quality of the intrusion… against the importance of the governmental interest alleged to justify the intrusion." *Tennessee v. Garner,* 471 U.S. 1, 8 (1985).

This inquiry is an "objective assessment," *Paige v. City of New Brunswick*, 680 F. App'x 107, 112 (3d Cir. 2017), questioning "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

Officer Wells argues that his actions were reasonable because it occurred "in the course of [his] attempt to control traffic so that he could identify and locate the fleeing carjacking/kidnapping," which he notes is authorized pursuant to 75 Pa. C. S. § 6109. (Def.'s Brief, p. 12). Chapter 61 of Pennsylvania's Vehicle Code, 75 Pa. C. S. §§ 6101 et seq., provides that "no local authority shall enact or enforce any ordinance on a matter covered by the provisions of this title unless expressly authorized." *Id.* § 6101(a). However, Section 6109(a), which Officer Wells highlights, explains that those provisions do not "prevent… local authorities on streets or highways within their physical boundaries from the reasonable exercise of their police powers." 75 Pa. C. S. § 6109(a). Then, the statute lists actions that are "presumed to be reasonable exercise of police power," including "regulating traffic by means of police officers or traffic-control devices," and "[a]dopting and enforcing such temporary or experimental regulations as may be necessary to cover emergencies or special conditions." 75 Pa. C. S. § 6109(a)(2), (12). Accordingly, Section 6109 provides, outside of what other provisions expressly authorized, that local authorities have authority to regulate traffic and cover emergencies outside. *See In re Provco Pinegood Sumneytown, LLC*, 216 A.3d 512, 520–21 (Pa. Commw. Ct. 2019) ("Pursuant to Section 6109(a) of the Vehicle Code, nothing in the Vehicle Code shall prevent local authorities on streets and "highways" within their boundaries from the reasonable exercise of their police powers. 75 Pa. C.S. § 6109(a)."); *Ferebee v. Macklin*, No. 22-1155, 2022 WL 1983977, at *5 (E.D. Pa. June 6, 2022) (explaining that Section 6109 provides local authorities powers that are not preempted by

state law). The statute does not, as Officer Wells suggests, provide that actions taken under this authority are presumed to be reasonable under the Fourth Amendment. *See, e.g., Com. v. Mercer*, 294 Pa. Super. 544, 440 A.2d 599 (1982) (considering Section 6109(a) in its analysis of what an officer had the "authority" to do and not in its analysis of whether the officer had "probable cause"). Critically, Officer Wells does not direct the Court to case law to support his assertion.

Turning to the circumstances of Plaintiff's seizure, a jury could find that Officer Wells' conduct was unreasonable. Although not directly on point, the unique nature of this case, as noted above, leads the Court to consider comparable circumstances—specifically, cases where courts have assessed the reasonableness of officers detaining bystanders during the execution of a warrant. Generally, pursuant to the Third Circuit precedent, "innocent persons can be detained for reasonable periods and under reasonable conditions during searches to protect their safety and the safety of the officers." *Jones v. Philadelphia Police Dep't*, 57 F. App'x 939, 940–41 (3d Cir. 2003) (citing *Torres v. United States*, 200 F.3d 179, 185 (3d Cir. 1999)). In *Willowby v. City of Philadelphia*, where officers detained bystanders that were congregating at a vacant property adjacent to the home that the officers were serving a lawful search warrant, the court analyzed the reasonableness of the officers' order to the bystanders to "get down" under Fourth Amendment principles. *See* 946 F. Supp. 369, 371-374 (E.D. Pa. 1996). The court held that the order was reasonable because the officers believed gun fire might be exchanged, so the command was "clearly a warning and a safety precaution to keep the bystanders and police out of harms way." *Id.* at 374. The officers' "concerns for safety in the face of dangerous confusion" provided the backdrop for the court to find that this action was reasonable. *Id.*

The *Willowby* court's decision relied on *Baker v. Monroe Township*, where the Third Circuit decided "what police may lawfully do with persons who happen to find themselves in the

middle of a drug raid." 50 F.3d 1186, 1190 (3d. Cir. 1995). In that case, police officers were conducting a drug raid while a family of four was visiting a relative's apartment in the same building. *See id.* at 1188-1189. As the family walked up to the door, the officers ordered them to "get down." *Id.* at 1189. The Circuit highlighted that the officer conducting the raid "feared it could result in violence," did not know whether the family owned the home that was going to be searched and believed the presence of bystanders would hinder the officers' ability to defend themselves if there were gunfire. *See id.* at 1191. Under these circumstances, according to the Circuit, the order was reasonable "until the situation was under control." *Id.* Specifically, the "need to ascertain the Bakers' identity, the need to protect them from stray gunfire, and the need to clear the area of approach for the police to be able to operate efficiently all made it reasonable to get the Bakers down on the ground for a few crucial minutes." *Id.* at 1192. Accordingly, the court held that the order did not constitute a Fourth Amendment violation. *Id.*

Here, the evidence does not conclusively demonstrate that it was reasonable for Officer Wells to stop Plaintiff, a bystander, in the middle of a police investigation. When Officer Wells decided to assist in the pursuit of Dean-Brewer, he was informed that the suspect vehicle was traveling in his direction at a high rate of speed. He believed, on information from other officers, that the suspect vehicle contained a kidnapped child. Certainly, to any reasonable person or officer, Wells was in a high-stakes situation. However, considering these circumstances, one may question the reasonableness of stopping an uninvolved bystander in the midst of that chaos. Unlike the officers' seizure in *Willowby* and *Baker*, freezing Plaintiff in that position cannot be clearly understood as an action in protection of her or the officers' safety. In fact, as demonstrated by the subsequent collision, the action put Plaintiff directly in harm's way by forcing her to remain in the path of a fleeing suspect. Wells testified that his intent was to "prevent any type of catastrophic

incident that could have occurred further up the street as they approached a major intersection." (ECF No. 28-3, p. 20). Notwithstanding the self-serving nature of this assertion, this explanation does not change the fact that his decision kept Plaintiff in risk of danger of what approached from behind. A jury can determine the reasonableness of these actions.

Furthermore, where Officer Wells allegedly seized Plaintiff cannot clearly be understood as a position that assisted him in his attempt to locate the suspect vehicle. Wells testified that he "slowed traffic down to try to observe where the suspect vehicle was." (ECF No. 28-3, p. 20). He looked for the suspect vehicle in the group of vehicles that had stopped and allowed the few vehicles that passed him to keep going because he did not "see the suspect vehicle in there." (ECF No. 28-3, p. 23). Unlike *Baker*, Wells' order to stop did not clear the area for him to conduct his investigation, but instead placed bystanders in the way of his operations. The parties dispute whether this placement became, for all intents and purposes, a barricade, which certainly is material to determining whether stopping her in that position was reasonable, so a jury must ultimately make this determination. Moreover, while there are videos of the conduct, the videos do not conclusively indicate the reasonableness of the seizure, so "a jury must resolve the competing accounts of the incident." *Paige*, 680 F. App'x 107, 112 (3d Cir. 2017) (affirming the denial of summary judgment because video evidence was inconclusive with respect to the reasonableness of the seizure). Plaintiff's Fourth Amendment violation is an issue that is ripe for trial.

## 2. Fourteenth Amendment

Next, Plaintiff invokes the state-created danger theory of liability, claiming that Officer Wells' actions put her in substantial risk of harm, such that her Fourteenth Amendment rights were violated. (Pl.'s Brief, p. 21-28). This doctrine relies on the Fourteenth Amendment's Due Process

Clause and "embodies the principle that the government has an obligation… to protect individuals against dangers that the government itself creates." *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 717 (3d Cir. 2018). Under this theory, a "constitutional violation can occur when state authority is affirmatively employed in a manner that injures a citizen or renders him more vulnerable to injury from another source than he or she would have been in the absence of state intervention." *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006) (internal citations and quotation marks omitted). Plaintiffs must satisfy four elements to state a viable Fourteenth Amendment claim sounded in the state-created danger doctrine:

> (1) [t]he harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Sauers*, 905 F.3d at 717. Plaintiff's use of this the doctrine isn't unusual, as courts in this Circuit have reviewed actions under this claim where a bystander was injured during the police pursuit of a fleeing suspect. *See, e.g., id.*

Officer Wells disputes Plaintiff's ability to satisfy the second prong of the doctrine's four-part test, arguing that there is no evidence that he acted with a degree of culpability to "shock the conscience." (Def.'s Brief, 15-20). The parties dispute what degree of culpability is required and whether said culpability exists here. I will first explain that the case law demands a demonstration that Officer Wells had an "intent to harm," then I will outline the facts that could lead a jury to find that the standard is satisfied.

### a.   The Intent to Harm Standard is Applied

In *County of Sacramento v. Lewis*, the Supreme Court explained that "when unforeseen circumstances demand an officer's instant judgment," an officer's "precipitate recklessness fails to inch close enough to harmful purpose to spark the shock" required under this standard. 523 U.S. 833, 853 (1998). Instead, it held that an officer's "intent to harm" must be demonstrated in high-speed chases to give rise to liability under the Fourteenth Amendment. *Id.* at 854. However, the Supreme Court held the door open for a lower standard to be applied where officers have "time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Id.* at 853. Applying *Lewis*, the Circuit has established three distinct levels of culpability that are required to shock the conscience, which are dependent "on how much time a police officer has to make a decision." *Sauers*, 905 F.3d at 717. As the time the officers have to deliberate decreases, the level of culpability increases as follows: (1) "[A]ctions undertaken with 'unhurried judgments,' with time for 'careful deliberation,' will be held to shock the conscience if they are 'done with deliberate indifference;'" (2) "[A]ctions taken within a time frame that allows an officer to engage in 'hurried deliberation'" are sufficient to shock the conscience "[w]hen those actions 'reveal a conscious disregard of a great risk of serious harm;'" and (3) "[A]ctions taken in a 'hyperpressurized environment'… will not be held to shock the conscience unless the officer has 'an intent to cause harm.'" *Id.* (internal citations omitted).

According to the Circuit in *Sauers*, this "framework for analysis applies to police-pursuit cases," such that "officers engaged in a high-speed pursuit will be subject to the full body" of the culpability spectrum. *Id.* at 717-18, 723. In that case, the Circuit applied the second tier of culpability—conscious disregard of a great risk of serious harm—where an officer had time to deliberate pursuing a suspect that committed a minor traffic offense prior to his pursuit at 100 mph

on public roads, which resulted in the death and injury of bystanders. *See id.* at 718. The Circuit

held that the following facts triggered their use of this standard:

> But when there is no compelling justification for an officer to engage in a high-speed pursuit and an officer has time to consider whether to engage in such inherently risky behavior, constitutional liability can arise when the officer proceeds to operate his vehicle in a manner that demonstrates a conscious disregard of a great risk of serious harm.

*Id.* at 723. In articulating this standard, the Circuit clarified that its holding "does nothing to alter

the longstanding principle" in *Lewis*—that the majority of high-speed pursuit cases will apply the

intent to harm standard because "most high-speed police pursuits arise when officers are

responding to emergencies or when they must make split-second decisions to pursue fleeing

suspects." *Id.* at 723. Stated otherwise, "the *Sauers* court explicitly left open the possibility of a

police pursuit claim considered under a conscious disregard standard, provided that (1) there is no

compelling justification to engage in a high-speed pursuit, and (2) the officer has time to consider

whether to engage in such inherently risky behavior." *Otero v. Kane*, No. 22-4141, 2024 WL

4173777, at *9 (E.D. Pa. Sept. 12, 2024).

Here, the Court will apply the intent to harm standard because of the circumstances

surrounding Officer Wells' actions.[8] After Officer Wells was informed that two suspects in a stolen

vehicle occupied by a kidnapped child were heading his direction, he turned his vehicle around to

locate the suspect vehicle. Then, still aware that the suspect vehicle was coming his direction, he

---

[8] In what appears to be an attempt avoid the application of the "shock the conscience" standard, the Plymouth Defendants briefly contend that "this case does not involve a pursuit by Officer Wells," but instead involves Officer Wells "responding to the pursuit by other law enforcement agencies in an attempt to apprehend the fleeing carjacking and kidnapping suspects." (Def.'s Brief, p. 16). The Plymouth Defendants provide no case law to support their argument. Accordingly, the Court will not interpret Officer Wells' actions as non-pursuit, as his own testimony describes that he was in pursuit of the suspect vehicle. (Officer Wells' Dep, Def.'s Exhibit A, ECF 24-1, p. 11) ("… I slowed the traffic… so I could observe for the suspect vehicle and try to rescue the 12-year-old girl.").

used his vehicle to slow oncoming traffic, which included Plaintiff. When sitting next to Plaintiff, the suspect vehicle swerved into the wrong lane, to which Officer Wells jolted his car directly head on, resulting in the suspect vehicle hitting Plaintiff. Unlike in *Otero*, where the suspect "did not commit or attempt a forcible felony" and other facts "could suggest that [the officer] considered the pursuit unjustified," 2024 WL 4173777, at *10, Officer Wells engaged in the pursuit of Dean-Brewer believing that he was assisting the apprehension of a stolen vehicle with a kidnapped child inside. While Plaintiff disputes whether a kidnapped child was in the vehicle, she does not dispute Officer Wells believed that a child was there. Certainly, when an officer reasonably believes that fleeing vehicle harbors a kidnapped child, then pursuit of that vehicle is justified.

Moreover, the evidence demonstrates that Officer Wells had very limited time to act. Video from Officer Well's dash camera indicates that these events took place over approximately 40 seconds, (Dash Camera, 20:55:36-20:56:08), including the mere five seconds between stopping his vehicle and maneuvering his vehicle directly against the suspect vehicle. (Dash Camera, 20:56:03-20:56:08). That said, Officer Wells had a short period of time to make quick decisions in the apparent high-stakes situation, such that this "hyper pressurized" environment in this case requires an "intent to harm" to establish liability.

### b. A Jury Could Find that Officer Wells Intended to Harm Plaintiff

Under the intent to harm standard, "conduct intended to injure in some way *unjustifiable by any government interest* is the sort of official action most likely to rise to the conscience-shocking level." *Davis v. Twp. of Hillside*, 190 F.3d 167, 171 (3d Cir. 1999) (citing *Lewis*, 523 U.S. at 834) (insertion omitted). A court's evaluation of "intent, particularly in constitutional cases, often must be inferred from circumstantial evidence." *Davis*, 190 F.3d at 174 (Mckee, J. concurring) (collecting cases). In this evaluation, courts cannot "segment a high-speed chase and

26

examine elements in isolation from each other;" but instead must consider the evidence in context of the entire pursuit. *Id*. at 171. When applying these principles, courts have "interpreted the 'intent to harm' standard very narrowly." *Otero*, No. 22-4141, 2024 WL 4173777, at *11 (E.D. Pa. Sept. 12, 2024). In *Davis*, for example, the Third Circuit did not find that officers' "actions were tainted by an improper or malicious motive," despite an officer directly ramming a fleeing suspect in violation of department policy. 190 F.3d at 171. Because the fleeing suspect's unlawful behavior was instantaneous, of which the officers did not cause, the court reasoned that the intent of the officers' instantaneous responses "was to do their job as law enforcement officers, not to cause injury." *Id.*

In this case, a jury could find that Officer Wells acted with a "purpose to cause harm unrelated to the legitimate object of arrest." *Lewis*, 523 U.S. at 836. Officer Wells, understanding that a stolen vehicle with a kidnapped child was heading his direction, turned his vehicle around and drove head-on towards the fleeing vehicle. At this moment, like the *Davis* officers, Officer Wells was undoubtedly faced with "lawless behavior… for which he [was] not to blame." 190 F.3d at 171. However, unlike *Davis*, Officer Wells response to said behavior put innocent bystanders in more danger than they were if they had not yielded to his action, such that a jury could infer that his intent was to cause the foreseeable results—harm to Plaintiff. Officer Wells, still aware that the suspect vehicle was approaching, commanded bystander-vehicles, including Plaintiff in her vehicle, to stop on the road that police were searching for Dean-Brewer's vehicle. Then, as Officer Wells held Plaintiff in this dangerous environment, instead of ordering her and others off the road or to continue driving, he pulled up directly next to Plaintiff immediately prior to striking the suspect vehicle. While "Officer Wells had mere seconds to make a quick decision to maneuver his vehicle to prevent their escape," (Def.'s Brief p. 19), he had already placed

Plaintiff and himself in a position that allowed him to strike the suspect vehicle, which was then stopped by Plaintiff's vehicle. And as mentioned, there is a material dispute whether Plaintiff was used as a barricade, so a jury must make this decision, and ultimately decide whether putting Plaintiff in that position is evident of Wells' intent to harm.[9]

Officer Wells attempts to compare this case to *Donahue v. Borough of Collingdale*, but unlike here, the officers in that case did not actively put the injured parties in harm's way. 714 F. Supp. 3d 504 (E.D. Pa. 2024). There, officers pursued a fleeing suspect at speeds upwards of 80 mph for about 90 seconds until the suspect "t-boned" a bystander-vehicle, killing one occupant and severely injuring the other. *See id.* at 511-513. The court held that there was no "genuine issue of fact to show that [the defendants] intended any harm distinct from apprehending [the suspect]." *Id.* at 514. In contrast to Officer Wells, the officers in *Donahue* did not command the injured parties into the position that they were in prior to the point of impact, but instead those officers were only "pursuing an actively fleeing suspect." *Id.* at 508. Without police intervention, the injured parties in *Donahue* were in position to be hit by happenstance.

Accordingly, because Officer Wells put Plaintiff in a position to be harmed by Dean-Brewer, it could be inferred that Officer Wells did so intending to harm Plaintiff. This finding by the jury would sufficiently satisfy the shock the conscience standard under the state created-danger theory.

### ii. *Officer Wells was on Notice that his Alleged Conduct Violated Plaintiff's Clearly Established Rights*

---

[9] Moreover, Plaintiff alleges, and Officer Wells denies, that he pointed his gun at her. This disputed fact is material to whether Wells' had an intent to harm Plaintiff. Because the video does not definitively depict whether this event occurred, a jury must make this determination. For this reason, in addition to what has already been articulated, summary judgment is denied for Plaintiff's Fourteenth Amendment claim.

Officer Wells argues that even if this Court were to hold that a reasonable jury could find that he violated the Plaintiff's constitutional rights, which I have, he still enjoys qualified immunity from Plaintiff's claims. An officer invoking this protection has the burden of establishing their entitlement to qualified immunity. *See Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021). Under the doctrine of qualified immunity, police officers are shielded from "civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Peroza-Benitez*, 994 F.3d at 165 (internal quotations omitted). Put more plainly, the Court must determine "if a reasonable officer would have known that [their] alleged conduct violated [Plaintiff's] rights." *Pinkney v. Meadville, Pennsylvania*, 95 F.4th 743, 747 (3d Cir. 2024) (citing *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)).

For a court to find that a right is clearly established, "there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited." *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016), *as amended* (Mar. 21, 2016). The clearly established right "must be particularized to facts of the case," rather than "defined at a high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017). Absent this particularity, qualified immunity would become "a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* As such, "for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Mammaro*, 814 F.3d at 169.

With respect to Officer Wells' alleged Fourteenth Amendment violation, by 1998, the Supreme Court "clearly established that an officer can be liable for a substantive due process violation resulting from a high-speed pursuit of a dangerously fleeing suspect only if the officer

intended to cause harm." *Saueres*, 905 F.3d at 720 (referencing *County of Sacramento v. Lewis*, 523 U.S. 833 (1998)); *see also Clark v. Merrell*, No. 19-1579, 2025 WL 565822, at *7 (E.D. Pa. Feb. 19, 2025) ("The standard of constitutional liability articulated in *Lewis* was clearly established prior to April 15, 2017, and police officers… were on fair notice that they could be subjected to constitutional liability for conducting a high-speed pursuit with a purpose to cause harm unrelated to the legitimate object of arrest."). Accordingly, because the underlying facts occurred in 2024, Officer Wells is not entitled to qualified immunity from Plaintiff's claim under the Fourteenth Amendment.

While the Fourth Amendment right that Officer Wells allegedly violated is not as explicitly outlined in the case law as the Fourteenth Amendment right, it was still clearly established at the time of the collision—sufficiently so as to prohibit this Court from shielding Wells from liability through qualified immunity. Police officers are on notice for conduct that "violates established law even in novel factual circumstances because a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 117 F.4th 503, 515 (3d Cir. 2024) (internal quotation marks omitted). Consequentially, and as in this case, "common sense may dictate that a constitutional violation has occurred where a constitutional violation is 'so obvious' that a government official has 'fair warning' that the conduct is unconstitutional." *Id.*

Here, Supreme Court precedent provided Officer Wells notice. In *Brower*, the Supreme Court held that the intentional placement of a roadblock that is designed to produce the stop of a fleeing suspect by physical impact, which then causes a stop of that suspect, constitutes a seizure under the Fourth Amendment. *See* 489 U.S. at 595-599. While coming to this holding, the Court

explained that other interventions with motorists, such as sideswiping a fleeing car to force it off the road, would be a seizure, so long as there was a "governmental termination of freedom of movement *through means intentionally applied*." *Id.* at 597. An officer is liable for such seizures, according to the Court, if the seizure is unreasonable. *See* 489 U.S. at 599. In other words, *Brower* clearly established a Fourth Amendment violation where a roadblock is unreasonably used to terminate a fleeing suspect's freedom of movement. From the *Brower* decision, it is obvious to conclude that innocent bystanders have a right not to be used in such barricades. Accordingly, by 1989, when *Brower* was decided, this commonsense extraction from this Supreme Court holding "gave 'fair notice' that involuntary detention of innocent motorists as forced participants in a manned civilian road block, or 'human shield' designed to trap a fleeing felony suspect, would impermissibly chill the Fourth Amendment rights of the civilians." *Kingdom v. City of Riviera Beach*, No. 04-80042, 2005 WL 8156292, at *6 (S.D. Fla. Jan. 26, 2005), *aff'd sub nom. Kingdom v. Riviera Beach, City of*, 154 F. App'x 131 (11th Cir. 2005) ("We also agree with the district court's finding that Kingdom's Fourth Amendment right to be free from unreasonable seizure was clearly established in May, 2002.").

Because, as analyzed above, whether Officer Wells seized Plaintiff as a barricade to apprehend the fleeing suspect is a material issue of fact that a jury must resolve, the Court can not conclude that Officer Wells is entitled to qualified immunity for his alleged Fourth Amendment violation.

### B. Plymouth Township Police Department is Not a Proper Defendant Under Section 1983

It is well settled in this Circuit that "a suit against a municipal agency should name the municipality itself." *Sorrells v. Philadelphia Police Dep't*, 652 F. App'x 81, 83 (3d Cir. 2016). A police department, a sub-division of a municipality through which that municipality "fulfills its

policing functions, [is] not a proper defendant in an action pursuant to 42 U.S.C. § 1983." *Martin v. Red Lion Police Dep't,* 146 F. App'x 558, 562 n.3 (3d Cir. 2005). Here, Plaintiff named the Plymouth Township Police Department as a defendant, who is not a proper party, instead of naming Plymouth Township—the municipality. (Am. Compl. ¶ 7). In her briefing, Plaintiff makes no attempt to persuade the Court that PTPD is a proper party. (Pl.'s Brief). Accordingly, because PTPD can not be sued under § 1983, summary judgment is granted for PTPD for Count I. *See Padilla v. Twp. of Cherry Hill,* 110 F. App'x 272, 278 (3d Cir. 2004) ("Because the Police Department is merely an arm of the Township, the summary judgment granted to the Police Department on the § 1983 claim was proper.").

### C. Plaintiff's Negligence Claim Can Be Presented to a Jury, But Her False Arrest/Imprisonment Claim Fails as a Matter of Law

The remaining claims against the Plymouth Defendants are under Pennsylvania law. Plaintiff asserts a False Arrest and False Imprisonment claim against Officers Wells and a Negligence claim against Officer Wells and PTPD. The Plymouth Defendants argue that (1) they are immune from these claims based upon Pennsylvania's Political Subdivision Tort Claims Act (the "Tort Claims Act"), 42 Pa. C. S. §§ 8541-8564; and (2) the claims fail as a matter of law.

The Tort Claims Act grants "absolute immunity to local agencies and its employees for official actions excluding [nine] statutorily defined exceptions." *Spiker v. Whittaker*, 553 F. App'x 275, 281 n.6 (3d Cir. 2014) (citing 42 Pa. C. S. §§ 8542, 8545). According to the Pennsylvania Supreme Court, the Act waives this immunity if:

> "(1) damages would be otherwise recoverable under common law or statute; (2) the injury was caused by the negligent act of the local agency or an employee acting within the scope of his official duties; and (3) the negligent act of the local agency falls within one of eight enumerated categories."

*White v. Sch. Dist. of Philadelphia*, 553 Pa. 214, 217 (1998) (internal citations omitted). Among these categories of exceptions, and particularly relevant to this case, is "vehicle liability." 42 Pa. C. S. § 8542. The Court must apply these statutory exceptions narrowly "[b]ecause the legislature expressed its clear intent to insulate political subdivisions from tort claims." *White*, 553 Pa. at 218.

Even under this narrow application, the Plymouth Defendant's immunity under the Tort Claims Act from Plaintiff's negligence claim is waived because Officer Wells' actions falls under the vehicle liability exception. The vehicle liability exception is defined as follows:

> *(1) Vehicle liability.*--The operation of any motor vehicle in the possession or control of the local agency, provided that the local agency shall not be liable to any plaintiff that claims liability under this subsection if the plaintiff was, during the course of the alleged negligence, in flight or fleeing apprehension or resisting arrest by a police officer or knowingly aided a group, one or more of whose members were in flight or fleeing apprehension or resisting arrest by a police officer. As used in this paragraph, "motor vehicle" means any vehicle which is self-propelled and any attachment thereto, including vehicles operated by rail, through water or in the air.

42 Pa. C. S. § 8542(b)(1). "Operation" in this exception, as explained by the Pennsylvania Supreme Court, is not limited to mobility, but rather "reflects a continuum of activity, which entails a series of decisions and actions, taken together, which transport the individual from one place to another." *Balentine v. Chester Water Auth.*, 648 Pa. 105, 123 (2018) (internal quotations and citations omitted). For example, "[t]he decisions of where and whether to park, where and whether to turn, whether to engage brake lights, whether to use appropriate signals, whether to turn lights on or off, and the like, are all part of the 'operation' of a vehicle." *Id.* Accordingly, in "[a] successful claim under the vehicle liability exception," a plaintiff must demonstrate that their injury was caused by the negligent operation of a sovereign party's vehicle, which can be "more than simply moving the vehicle." *Hernandez v. Indep. Tree Serv. LLC*, No. 19-0510, 2019 WL 1773374, at *2 (E.D. Pa. Apr. 22, 2019).

This case falls squarely into the vehicle liability exception of the Tort Claims Act. In her Amended Complaint, Plaintiff pleads that Officer Wells was negligent in the "operation of his vehicle." (Am. Compl. ¶ 55). At her deposition, Plaintiff testified that she stopped her vehicle in response to Officer Wells driving towards her with flashing lights and active sirens. Officer Wells testified that, when both parties were stopped, he used his vehicle to intercept the suspect-vehicle speeding in his direction, which then crashed into Plaintiff. In addition to this testimony, Officer Wells' dash camera captures these events on video. As outlined above, both the physical movement of the vehicle and the use of signals, like flashing lights and sirens, constitute the type of vehicle operation that triggers the exception. Officer Well's continuous motion and operation of his vehicle are the basis of Plaintiff's negligence claim, sufficiently satisfying the vehicle liability exception.

The Plymouth Defendants argue that this exception does not apply because Officer Wells' operation of his vehicle is not the proximate cause of Plaintiff's injury.[10] However, in *Jones v. Chieffo*, the Pennsylvania Supreme Court has held "that a governmental party is not immune from liability when its negligence, along with a third party's negligence, causes harm." 549 Pa. 46, 52 (1997). In that case, as an officer pursued three fleeing vehicles, one of the vehicles crashed into the bystander-plaintiff, who then claimed that the police department was liable for his injuries. *See id.* at 48-49. The police department argued that it could not be held "liable for the criminal or negligent acts of the fleeing driver." *Id.* at 49. The Court disagreed with this framing of the case,

---

[10] In support of their claim, the Plymouth Defendants cite to *Jewell v. Ridley Township*, where the Third Circuit upheld a district court's decision to dismiss a negligence claim against a defendant police officer that pursued a fleeing suspect. 497 F. App'x 182, 187 (3d Cir. 2012). However, this case does not support the Plymouth Defendants causation argument. There, the Third Circuit affirmed the district court's decision because "the pursuit was conducted in conformity with the Officers' duty"—not on account of a lack of causation. *Id.*

explaining that a "municipality can be liable despite the presence of a third party if it is jointly negligent," so "a jury could find that Appellants are jointly liable with the driver and that their own negligence was a substantial factor causing [plaintiff's] injuries." *Id.* at 50. Here, Plaintiff alleges that Officer Wells' actions caused her to stop, and Officer Wells testifies the suspect vehicle hit Plaintiff's vehicle after hitting his vehicle, so a reasonable jury could find that his actions were a substantial factor in Plaintiff's injuries.

Because the facts indicate that the Plymouth Defendants are not immune from Plaintiff's negligence claim, the Court will review the merits of said claim. A negligence claim requires a plaintiff to prove that "(1) the defendant owed the plaintiff a duty or obligation recognized by law; (2) the defendant breached that duty; (3) a causal connection existed between the defendant's conduct and the resulting injury; and (4) actual damages occurred." *Grove v. Port Auth. of Allegheny Cnty.,* 655 Pa. 535, 554 (2019). In addition to contesting the causal element, which I've addressed above, Plymouth Defendants argue that Officer Wells did not breach the duty that he owed Plaintiff. They claim that there is no breach because Plaintiff has not demonstrated that Officer Wells' conduct did not comply with 75 Pa. C. S. § 3105, which outlines "the privileges offered to Emergency Vehicle operators in Pennsylvania." (Def.'s Brief, p. 31). The Third Circuit summarized Section 3105:

> Police officers are granted certain privileges under Pennsylvania law "when in the pursuit of an actual or suspected violator of the law," which allow the officers to "[p]roceed past a red signal indication or stop sign ... after slowing down as may be necessary for safe operation," to "[e]xceed the maximum speed limits so long as the driver does not endanger life or property," and to "[d]isregard regulations governing direction of movement, overtaking vehicles or turning in specified directions." 75 Pa. Cons.Stat. Ann. § 3105(a)–(b). These privileges only apply when the vehicle's audible and visual signals are in use, *see id.* § 3105(c), and **they do not relieve the driver of "the duty to drive with due regard for the safety of all persons**." *Id.* § 3105(e).

*Jewell,* 497 F. App'x at 187. In spite of these privileges, which do "not create a separate statutory duty on emergency vehicle drivers," Section 3105 "recognizes that emergency vehicle drivers still owe a common law duty to the public at large, i.e. innocent bystanders." *Sellers v. Twp. of Abington*, 630 Pa. 330, 347, 106 A.3d 679, 688 (2014); *see also Frazier v. Com.*, 845 A.2d 253, 260 (Pa. Commw. Ct. 2004) ("A residual or "floor" duty remains."). Accordingly, the central question isn't whether Officer Wells' conduct complied with the statute, but rather whether Wells breached his duty to drive with due regard for the safety of all persons. "This standard of care results in liability if the officer was negligent under emergency circumstances." *Peterson v. Berkeley Cnty. Sheriff's Dep't*, No. 23-00330, 2023 WL 8935058, at *5 (M.D. Pa. Dec. 27, 2023) (citing *Johnson v. City of Phila.*, 808 A.2d 978, 982 (Pa. Commw. Ct. 2002)).

Considering all the evidence in the light most favorable to Plaintiff, whether Officer Wells is negligent should be determined by a jury. Courts have considered the following factors in its analysis of negligence: "speed of pursuit, the area of pursuit, and the presence or absence of audible or visual warnings." *Cornelius v. Roberts*, 71 A.3d 345, 352 (Pa. Commw. Ct. 2013) (citing *Kuzmics v. Santiago*, 256 Pa. Super. 35, 42, 389 A.2d 587, 591 (1978)). In *Jewell*, for example, where officers pursued a drunk driver until that driver hit and paralyzed a bystander, the Third Circuit found that "the pursuit was conducted in conformity with the Officers' duty to drive with due regard for the safety of all persons." 497 F. App'x at 187. The Circuit outlined the following facts in support of their conclusion:

> Here, the lights and sirens of Corporal Bongiorno's car were activated during the pursuit, and the speed of the pursuit did not exceed thirty-five miles per hour until the final moments when Smith suddenly accelerated. The Officers had reason to believe it would be dangerous for Smith to continue driving because they suspected he was drunk and had personally observed his erratic driving.

*Id.* Like the facts in *Jewell*, the parties do not dispute that Officer Wells also had his lights and sirens activated, was not driving at an erratic speed, and believed that there was emergency that warranted immediately stopping the fleeing suspect. However this case diverges from *Jewell* with respect to how Plaintiff was put in position to be harmed by Dean-Brewer. Instead of the fleeing suspect running into an innocent bystander by happenstance, as in *Jewell*, Officer Wells used his police vehicle to stop Plaintiff in the middle of a search for a fleeing suspect, placing Officer Wells in position to then be hit by Dean-Brewer. Based on these actions, a jury could find that Wells' use of his vehicle breached his duty. Accordingly, summary judgment is denied for Plaintiff's negligence claim.

In addition to this exception for negligent acts, the Act "does not grant immunity to government employees whose conduct goes beyond negligence and constitutes 'a crime, actual fraud, actual malice or willful misconduct.'" *Spiker*, 553 F. App'x at 281 n.6 (quoting 42 Pa. C. S. § 8550). The Pennsylvania Supreme Court has held that "[w]illful misconduct, for the purposes of tort law ... mean[s] conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." *Renk v. Pittsburgh*, 537 Pa. 68, 641 A.2d 289, 293 (1994) (internal citation omitted). As such, to apply this exception, the Court "must find 'not only that the [Officers] intended to commit the acts that [they are] accused of carrying out, but also that [the Officers] understood that the actions [they] intended to take were illegal and chose to take the actions anyway.'" *Boardman v. City of Philadelphia*, 661 F. App'x 183, 188 (3d Cir. 2016) (quoting *Maiale v. Youse*, 2004 WL 1925004, at *11 (E.D. Pa. Aug. 27, 2004)). In this case, for Plaintiff's false arrest/false imprisonment claim, she must demonstrate that Officer Wells "intentionally arrested her knowing that they lacked probable cause to do so." *Boardman v. City of Philadelphia*, 661 F. App'x 183, 188 (3d Cir. 2016)

(cleaned up); *see also Alleyne v. Pirrone*, 180 A.3d 524, 543 (Pa. Commw. Ct. 2018). ("The elements of false arrest/false imprisonment are: (1) the detention of another person (2) that is unlawful."). However, Plaintiff's claim rests on the same faulty premise as her identical false arrest/imprisonment claim under Section 1983, *see Russoli v. Salisbury Twp.*, 126 F. Supp. 2d 821, 869 (E.D. Pa. 2000) ("Pennsylvania state law false arrest claims and federal constitutional false arrest claims are co-extensive both as to elements of proof and elements of damages."). Because she was neither arrested nor detained, the claim fails as a matter of law. Summary judgment is granted for Officer Wells for the false arrest/imprisonment claim.

### D. A Reasonable Jury Could Find Punitive Damages

Finally, Plymouth Defendants request the Court to dismiss Plaintiff's claim for punitive damages for her claims under Section 1983. (Def.'s Brief, p. 32). Because summary judgment was granted for PTPD for said claims, the Court will only address punitive damages for those claims against Officer Wells.

Individual municipal officials can be held liable for punitive damages under Section 1983. *See Abraham v. Pekarski*, 728 F.2d 167, 172 (3d Cir. 1984). In this Circuit, "[a] court cannot impose a punitive damages award against an official acting in his or her individual capacity unless the actor's conduct is, at a minimum, reckless or callous." *Startzell v. City of Philadelphia*, No. 05-05287, 2007 WL 172400, at *22 (E.D. Pa. Jan. 18, 2007) (citing *Brennan v. Norton,* 350 F.3d 399, 428-29 (3d Cir.2003)). Therefore, "[i]t is sufficient for the plaintiff to show either that the defendant acted . . . with actual knowledge that he was violating a right 'secured by the Constitution and laws,' or that the defendant acted with reckless disregard of whether he was thus violating such a right." *Cochetti v. Desmond*, 572 F.2d 102, 106 (3d Cir. 1978). However, "despite its utility as a deterrent, the punitive damage remedy must be reserved, we think, for cases in which the

defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief." *Id.* In this case, as outlined repeatedly above, Officer Wells at minimum can be found by a jury to have acted with, at a minimum, reckless disregard of Plaintiff's rights.

## V.    CONCLUSION

For the foregoing reasons, the Plymouth Defendant's Motion for Summary Judgment is GRANTED in PART and DENIED in PART.

An appropriate Order follows.

**IT IS SO ORDERED.**

BY THE COURT:

/s/ John Milton Younge
**Judge John Milton Younge**